05-5235-pr
Bell v. Miller

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: August 29, 2007          Decided: August 31, 2007)

Docket No. 05-5235-pr

- - - - - - - - - - - - - - - - - - - -x

DERRICK BELL,

Petitioner-Appellant,

- v.-

DAVID L. MILLER, Superintendent
of Eastern Correctional Facility,
ANDREW CUOMO, Attorney General of
New York, and RAYMOND CUNNINGHAM,
Superintendent of Woodbourne Correctional
Facility,[*]

Respondents-Appellees.

- - - - - - - - - - - - - - - - - - - -x

Before:          JACOBS, Chief Judge, KATZMANN, and HALL,
                 Circuit Judges.

Appeal from a judgment of the United States District

---

[*] We direct the Clerk of Court to amend the official
caption as noted above.

Court for the Eastern District of New York, Allyne R. Ross, Judge, denying Petitioner-appellant Derrick Bell's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, we reverse the decision of the District Court and remand for the entry of judgment conditionally granting the writ and ordering Derrick Bell's release unless the State provides him a new trial within 60 days.

Anne S. Raish (Mark Pomerantz, of counsel, Stephen H. Yuhan, on the brief) Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York, NY, for Petitioner-Appellant.

Lara M. Shalov, Stillman, Friedman, & Shechtman, P.C., New York, NY for Petitioner-Appellant.

Steven Banks, Lawrence T. Hausman, The Legal Aid Society, New York, NY for Petitioner-Appellant.

Howard B. Goodman, Assistant District Attorney (Ann Bordley and Leonard Joblove, of counsel, Charles J. Hynes, District Attorney, Kings County, on the brief), Office of the Kings County District Attorney, Brooklyn, NY.

DENNIS JACOBS, Chief Judge:

Petitioner-appellant Derrick Bell, who was convicted of robbery and assault in New York State Supreme Court, Kings County, is seeking a writ of habeas corpus on the ground that his lawyer was constitutionally deficient for having failed to consult a medical expert regarding the reliability of the complaining witness's identification--the only evidence tying Bell to the crime. The witness was shot in the thigh, lost half his blood, was heavily medicated, lapsed into a coma for eleven days, and identified Bell by name after recovering consciousness--notwithstanding that at the scene of the attack he had described his attacker generically, as though the attacker was unknown to him. The District Court denied the petition on the ground that the state court's rejection of Bell's claims was not based on an unreasonable application of federal law, see 28 U.S.C. § 2254(d). We reverse.

## BACKGROUND

Brentonol Moriah was held up at gunpoint as he was walking in Brooklyn at 2:30 a.m. on July 16, 1996. His assailant, armed with a full-length shotgun, demanded money.

3

Soon after Moriah surrendered the contents of his pockets, headlights flashed from a nearby intersection and the assailant fired into Moriah's thigh and fled, weapon in hand.

When the police came to the scene, Moriah was lying on the street, having lost copious amounts of blood. Moriah told the officers that someone tried to rob him and then shot him in the thigh. A police officer testified that Moriah described the perpetrator (in Moriah's words) as "a male black, wearing a lemon-colored shirt." Moriah said nothing to the officers that would evince any familiarity with the shooter; accordingly, the police reports from the crime scene list the perpetrator's identity as "unknown" and "unidentified."

For the following eleven days, Moriah was hospitalized in a heavily sedated state, comatose if not actually in a coma. When he regained consciousness on July 28, 1996, Moriah told the detective that his assailant was one Derrick Bell, who had been his neighbor in a rooming house.

Bell was arrested on August 14, 1996, and charged with first-degree assault, second-degree assault, fourth-degree

4

grand larceny, and two counts of first-degree robbery.  Bell had no prior criminal record.

On August 19, 1996, Moriah again named Bell in videotaped grand jury testimony given from his hospital bed. Moriah stated that he continued to take painkillers every four hours and to suffer from memory lapses and dizziness.

**A. Bell's State Trial**

At Bell's trial, Moriah was the only prosecution witness who identified Bell as the assailant.  Moriah testified on direct that he and Bell shared a bathroom and kitchen at a rooming house for more than a year, that they spoke occasionally and never argued or fought, and that on the night of the crime he stood face-to-face with Bell for five minutes.  On cross, Moriah admitted that he first named Bell eleven days after the crime took place; and that he did not recall speaking with police officers on the night of the crime.  Bell's counsel asked Moriah no questions about the medications he was administered while in the hospital (including at the time he first identified Bell as his assailant), nor did he ask about Moriah's memory loss,

5

which, according to Moriah's grand jury testimony, persisted for at least a month after the crime.

Dr. Robert Brewer, the emergency room surgeon who treated Moriah on the night of the crime, testified for the prosecution that Moriah lost 50 percent of his blood as a result of the shooting. On cross-examination, Bell's trial counsel inquired about the effect of that blood loss on Moriah's consciousness when he arrived at the hospital. Counsel did not ask about the impact of blood loss on memory, nor did he ask about the medications that were given to Moriah at the hospital.

The prosecution called four other witnesses. The policeman who had interviewed Moriah at the crime scene testified as to Moriah's description of his assailant: "a male black wearing a lemon-colored shirt." The detective assigned to the case testified that Moriah first identified Bell as the perpetrator eleven days after the crime took place, and that he was unable to interview Moriah before then because Moriah had been unconscious. Martin Payne, who lived near the crime scene, testified that on the night of the crime, he heard a person scream "no" several times,

6

followed by a gunshot; however, Payne did not see the shooting. Richard Edmonds, the landlord of the rooming house where Moriah and Bell once lived, testified about his tumultuous landlord-tenant relationship with Bell.

Bell testified that he left work around midnight to join friends, and they all played cards until five o'clock the following morning. Bell's three alibi witnesses confirmed that they played cards with Bell on the night in question.

The jury convicted Bell of first-degree robbery and second-degree assault. The trial court sentenced Bell to concurrent sentences of 12½-to-25 years on the robbery count and seven years on the assault count, the maximum term for both crimes.

**B. State Appeal**

Bell filed a timely notice of appeal in New York State Supreme Court. His direct appeal asserted various claims of ineffective assistance of trial counsel but did not challenge counsel's failure to consult a medical expert. The Second Department affirmed, <u>People v. Bell</u>, 298 A.D.2d

398 (2d Dep't 2002), and the New York Court of Appeals denied leave to appeal. People v. Bell, 99 N.Y.2d 555 (2002).

On February 13, 2004, Bell filed a motion to vacate his conviction pursuant to N.Y. Crim. Proc. Law § 440.10. There, for the first time, Bell argued that his trial counsel was ineffective for having failed to consult a medical expert regarding the effects of trauma, blood loss and painkillers on Moriah's memory.[1] In support of his § 440 motion, Bell submitted the affidavit of Dr. Elkhonon Goldberg, a neuropsychologist affiliated with New York University and Columbia University, who reviewed the police reports from the case, Moriah's grand jury and trial testimony, and the trial testimony and affidavit of Dr. Brewer. Dr. Goldberg opined that: "Mr. Moriah's testimony contains unequivocal evidence that he suffered from retrograde amnesia for the events predating the loss of

---

[1] Other grounds for asserting ineffective assistance were presented in Bell's § 440 motion and in the habeas petition, but those grounds are not before us here, as the Certificate of Appealability is limited to the medical expert issue. For the sake of simplicity, we refer to this sole remaining claim as Bell's "ineffective assistance claim."

consciousness"; the retrograde amnesia was exacerbated by such anxiolytic and amnestic medications as Dr. Brewer attested were likely administered to Moriah in the emergency room;[2] false memories can be persistent and dominant, overriding true memories; and Moriah's was unlikely to have regained full consciousness when he first named Bell. Accordingly, Dr. Goldberg concluded that Moriah's identification of Bell was unreliable.

On October 4, 2004, the state court denied Bell's § 440 motion without a hearing. It applied N.Y. Crim. Proc. Law § 440.10(2)(c) to Bell's ineffective assistance claim, citing as unjustifiable Bell's failure to raise the issue on direct appeal.[3] The court added: "But if the merits were reached, the result would be the same." The state court

---

[2] Mr. Moriah's medical records were marked as exhibits, but the District Attorney's Office has been unable to retrieve them. It is unclear whether Bell could have obtained them by other means or whether he will be able to do so now.

[3] § 440.10(2)(c) mandates denial of a motion to vacate where, though "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's . . . unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him."

observed that Dr. Goldberg's affidavit was "fraught with hedge words," and questioned whether, at the time of Bell's trial in 1997, Goldberg's expert testimony regarding a "single witness identification issue" would have been admissible in a New York State court.

**C. Federal Habeas Proceedings**

Bell filed his federal habeas petition in the Eastern District of New York on February 5, 2005. On August 12, 2005, the District Court issued an opinion denying the petition and declining to issue a Certificate of Appealability. The District Court concluded that Bell's ineffective assistance claim was not procedurally barred because N.Y. Crim. Proc. Law § 440.10(2)(c) is not an "adequate" state ground because New York courts do not apply that rule regularly to ineffective assistance claims, as such claims often depend on extrinsic evidence and therefore must be brought through collateral attack. Bell v. Miller, No. 05-cv-0663, 2005 WL 1962413, at *5 (E.D.N.Y. Aug. 12,

10

2005). This ruling is unchallenged on appeal.[4] The District Court also concluded that because the state court decision "provided a full analysis" of Bell's ineffective assistance claim, it constituted an "adjudication on the merits," triggering the more deferential standard of review required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1). Id. at *6. This ruling is challenged, and decided below.

As to the merits, the District Court found that Bell did not show that the failure of trial counsel to consult a medical expert fell below prevailing professional norms in 1997 when Bell was tried. Id. at *7. The District Court distinguished the cases Bell relied on as applying only to expert medical testimony in child sexual abuse cases. Id. at *8. The District Court also found that Bell failed to show prejudice, characterizing Dr. Goldberg's conclusions as

---

[4] The State does not contest this aspect of the District Court's opinion on appeal, and so we decline to address it. See Jimenez v. Walker, 458 F.3d 130, 141 n.8 (2d Cir. 2006) ("Because the existence of an adequate and independent procedural bar is not jurisdictional in the habeas context, a federal court is not required to raise it sua sponte; rather, it is a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter." (internal citation omitted)).

11

attenuated and speculative.  <u>Id.</u>

On June 12, 2006, this Court issued a Certificate of Appealability on the sole question of whether trial counsel's failure to consult a medical expert constituted ineffective assistance of counsel.

**DISCUSSION**

We review <u>de novo</u> the District Court's denial of Bell's petition for habeas corpus.  <u>Thibodeau v. Portuondo</u>, 486 F.3d 61, 64 (2d Cir. 2007).

**I. AEDPA Deference**

Under AEDPA, if a habeas petitioner's claim "was adjudicated on the merits in State court proceedings," a federal court can grant habeas only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d).

An "adjudication on the merits" is one that "(1)

disposes of the claim on the merits, and (2) reduces its disposition to judgment." Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001) (emphasis added and internal quotation marks omitted).  The state court's ruling on Bell's § 440 motion discussed the merits and was reduced to a judgment; but the wording of the opinion reflects that the disposition was not premised on the court's view of the merits.  The discussion of the merits was preceded by a contrary-to-fact construction:  "if the merits were reached, the result would be the same."  And a contrary-to-fact construction is not the same as an alternative holding.  See Zarvela v. Artuz, 364 F.3d 415, 417 (2d Cir. 2004) (concluding that state court had reviewed the claim on the merits where it found "petitioner's claim to be unpreserved, and, in any event, without merit," constituted an adjudication on the merits) (emphasis added).  We decline to read a contingent observation as an "adjudication on the merits."  Accordingly, we review Bell's claim de novo.

**II. Merits**

A criminal defendant asserting that counsel is

13

constitutionally deficient must show that the lawyer's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). The standard of Strickland "is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on [it]." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

Bell's claim threads this needle. The only evidence connecting Bell to the crime was Moriah's testimony. Three friends testified that Bell was elsewhere playing cards. Given the trauma Moriah endured and the medical treatments he received, Moriah's memory was highly vulnerable to attack by scientific evidence. Minutes after an encounter in which he stood face-to-face with the assailant for five minutes, Moriah told police officers that his assailant was a "male black wearing a lemon-colored shirt," a description that implicitly but undeniably indicates that the assailant was a stranger: one does not fall back on general features (a

14

"male black") or the color of a shirt ("lemon" yellow) to express the identity of a person known by name or affiliation.  By the time Moriah identified Bell as the assailant, Moriah had (in sequence) lost nearly half his blood, undergone surgery, would (in usual course) have been given anxiolytic and amnestic pharmaceuticals, entered a sedated, coma-like state, remained semi-conscious (at best) for eleven days, and awakened with cognitive abilities that were in doubt.  On August 19, 1996, over a month after the initial trauma, Moriah reported that he continued to take painkillers and suffer memory loss and dizziness.  And he had forgotten altogether the conversation at the crime scene in which he described his assailant but did not name him.

Taking the Strickland requirements in reverse order, there is a "reasonable probability" that had trial counsel consulted with a medical expert, "the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  The prosecution's case against Bell was thin--there was no eyewitness other than Moriah; no witness or other evidence (forensic or otherwise) linked Bell to the crime. See Strickland, 466 U.S. at 696 ("a verdict . . . only

15

weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support").  Impeaching Moriah's memory was therefore all in all for the defense.  Armed with the insight and advice of a medical expert, a lawyer could have vastly increased the opportunity to cast doubt on this critical evidence.

It is likely that the state trial court would have permitted a medical expert to testify as to the effects of trauma, blood loss, and anxiolytic and amnestic medications on the human brain, as those topics are well "beyond the ken of the typical juror."  People v. Taylor, 75 N.Y.2d 277, 288 (1990) (internal citation omitted); see, e.g., People v. Cronin, 60 N.Y.2d 430, 433-34 (1983) (reversing trial court's preclusion of expert testimony on the impact of alcohol, marijuana and Valium on defendant's ability to act purposefully); People v. Real, 137 A.D.2d 416, 416 (1st Dep't 1988) ("Since the key issue for the jury's determination was whether defendant could have formed the required intent for the charged crimes, the court erred in precluding defendant from calling an expert to testify as to the effect of 'angel dust' intoxication on his ability to

16

form such intent."). The State cites cases to show that expert testimony on the reliability of eyewitnesses was inadmissible in New York. See, e.g., People v. Lee, 96 N.Y.2d 157 (2001). But those cases exclude expert testimony from social scientists on the fallibility of eyewitness identifications in general.

True, counsel cross-examined Moriah and Dr. Brewer in an effort to cast doubt on Moriah's identification. But counsel's failure even to investigate the scientific implications of Moriah's trauma, blood loss and sedation handicapped his cross-examination of those key prosecution witnesses. See Eze v. Senkowski, 321 F.3d 110, 129 (2d Cir. 2003) (explaining that by not investigating the scientific accuracy of prosecution witness's conclusions, counsel "missed out on the chance to impeach him on contrary medical literature"). Thus counsel failed to ask Dr. Brewer how Moriah's blood loss--estimated to be 50 percent--might have altered Moriah's memory of the crime, including the potential for retrograde amnesia. And counsel failed to ascertain from Dr. Brewer what drugs he administered to Moriah, let alone how those medications might have impacted

17

Moriah's memory. Likewise, counsel failed to elicit any testimony from Moriah about those medications, even though Moriah had testified to the grand jury (on videotape) that, over a month after the crime, he continued to take painkillers and suffer memory lapses and dizziness.

As to the first requirement under Strickland, we must make "every effort . . . to eliminate the distorting effects of hindsight," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689 (internal quotation marks omitted). Even affording this deference, we conclude that counsel's performance was deficient.

Counsel's performance cannot fairly be attributed to a "strategic decision" arrived at by "diligent counsel . . . draw[ing] a line [based on] good reason to think further investigation would be a waste." Rompilla v. Beard, 545 U.S. 374, 383 (2005). Bell's lawyer failed even to consider consulting a medical expert regarding the reliability of

Moriah's memory.  Cf. Wiggins v. Smith, 539 U.S. 510, 525-529 (limiting scope of investigation into potential mitigation was not entitled to deference because it was made at an unreasonable stage, rendering an informed decision impossible); Williams v. Taylor, 529 U.S. 362, 390 (2000) (failing to uncover and present extensive mitigating evidence could not be justified on decision to focus on other defense because that decision was made prematurely, without the benefit of a thorough investigation).

Moreover, the record reveals no "tactical justification for the course" trial counsel chose.  United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam).  The defense proceeded along two strategic lines: impeaching Moriah and establishing an alibi.  The first of these would have been promoted, without any appreciable downside, by expert medical testimony on the impact that blood loss and painkillers had on Moriah's memory.  See, e.g., Pavel v. Hollins, 261 F.3d 210, 219 (2d Cir. 2001) (finding ineffectiveness for failure to call witness whose testimony could have bolstered defense theory).

Our disposition of this appeal does not announce a per

19

se rule requiring a defense counsel to consult with a medical expert in order to cast doubt on a key prosecution witness. But where the only evidence identifying a criminal defendant as the perpetrator is the testimony of a single witness, and where the memory of that witness is obviously impacted by medical trauma and prolonged impairment of consciousness, and where the all-important identification is unaccountably altered after the administration of medical drugs, the failure of defense counsel to consider consulting an expert to ascertain the possible effects of trauma and pharmaceuticals on the memory of the witness is constitutionally ineffective.

**CONCLUSION**

For the foregoing reasons, we reverse the decision of the district court and remand for the entry of judgment conditionally granting the writ and ordering Derrick Bell's release unless the State provides him a new trial within 60 days. The mandate will issue forthwith.